UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEST VIEW RESEARCH, LLC, a California corporation,<br>           Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AG, a German corporation; BMW OF NORTH AMERICA, LLC, a Delaware corporation; and BMW MANUFACTURING CO., LLC, a Delaware corporation,<br>           Defendants.<br><br>And Related Counterclaim(s). | Case No.: 14-CV-2670-CAB (WVG)<br><br>**ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[Doc. No. 89] |

Before the Court is the motion for judgment on the pleadings filed by Bayerische Motoren Werke AG, BMW of North America, LLC and BMW Manufacturing Co., LLC, (collectively, "BMW"). [Doc. No. 89.] BMW argues that United States Patent Nos. 8,301,456 and 8,311,834, which Plaintiff West View Research, LLC ("West View") asserts against BMW, are invalid because they are not directed to patentable subject matter under 35 U.S.C. §101. West View opposed the motion. [Doc. No. 90.] For the reasons set forth below, the motion is GRANTED.

## I. Background

The '456 patent is titled "Electronic Information Access System and Methods." [Doc. No. 89-1 at 5-44.][1] The '834 patent is titled "Computerized Information Selection and Download Apparatus and Methods." [Doc. No. 89-1 at 46-86.] Both patents are continuations of United States Patent No. 6,615,175 for a "'Smart' Elevator System and Method." The common specification discloses a system and subsystems utilizing computer hardware, software and other peripherals to provide information to occupants in an elevator or users of other "personnel transport devices," such as moving walkways or shuttles. Among the many sub-systems described in the specification is a system designed to identify authorized users and provide them with access or information personalized to the identified user.[2]

The continuation claims of the '456 and the '834 patents, filed some 13 years after the original parent application, relate to the disclosed user identification subsystem. The asserted claims are directed at an information system that uses electromagnetic energy to identify whether one is an authorized user of the information system. Then, if the system determines that the person is authorized to access information, the system is configured to communicate information, perhaps tailored or specific to the person, to a personal electronic device of the authorized user.[3]

Claim 1 of the '456 patent reads:

> 1. An information system associated with a transport apparatus, the transport apparatus configured to move from one location to another, the access to information of said information system being authorized for only one or more certain persons, the system comprising:
>    an antenna adapted to receive electromagnetic energy, said electromagnetic energy encoding first data associated with at least one person; and

---

[1] Page cites to docket references are to the CM/ECF assigned page numbers.
[2] The portions of the common specification discussed herein are referenced to the column and line locations in the '456 patent. [Doc. No. 89-1 at 39-40, Col. 17:46-20:6.]
[3] The asserted Claims of the '456 patent are independent Claim 1 and its dependent claims 2, 4, 6, 7, 8 and 17.

> processing apparatus in signal communication with said antenna, said processing apparatus configured to:
> access a first database containing second data relating to said one or more certain persons;
> analyze at least portions of said first data and said second data to determine if said at least one person is authorized to access said information; and
> if said at least one person is authorized access, facilitate download of said information to a personal electronic device (PED) of said at least one person.

[Doc. No. 89-1 at 42, Col. 24:38-55.] The asserted dependent claims add these limitations:

> 2. The system of claim 1, wherein the processing apparatus is further configured to enable data communication with the PED before said download occurs.
> 4. The system of claim 1, further comprising an interrogator apparatus configured to elicit transmission of said electromagnetic energy from a radio frequency device associated with the at least one person.
> 6. The system of claim 1, wherein the information comprises information specifically tailored for the at least one person based on more prior preferences or selections of the at least one person.
> 7. The system of claim 1, wherein the information comprises information specific to the at least one person.
> 8. The system of claim 1, wherein the antenna is configured for short-range radio frequency communications with a corresponding radio frequency device of said at least one person.
> 17. The system of claim 1, where in the system is further configured to retain a record of said access by said at least one person.

[Doc. No. 89-1 at 42-43, Col. 24:56-25:34.]

West View asserts four independent claims of the '834 patent.[4] Claim 36 and its dependent claims are representative:

> 36. A method of providing information to a user of a portable electronic apparatus, the method comprising:

---

[4] The asserted Claims of the '834 patent are independent Claim 1 and its dependent claim 4, independent claim 36 and its dependent claim 39, independent claim 52 and its dependent claim 54, and independent claim 66.

> receiving, via a wireless link, data specifically identifying a wireless device, the device associated with a user of the portable electronic apparatus;
> based at least in part on the data, identifying at least one information profile associated to that user; and
> causing provision of information configured according to the at least one profile to the portable electronic apparatus via a data interface;
> wherein said data is part of a radio frequency (RF) signal emitted at a particular frequency when proper authentication of an interrogation apparatus by said wireless device occurs.
>
> 37. The method of claim 36, wherein said wireless device comprises a short range radio frequency identification (RFID) device, and the data interface comprises a data interface operating according to a communication protocol different than that of the RFID device.
> 38. The method of claim 37, wherein the portable electronic apparatus comprises application software resident thereon, the software configured to receive the provided information and store it within the storage device of the portable electronic apparatus.
> 39. The method of claim 38, wherein the act of causing provision comprises causing provision of information relevant and useful to the user, the information relevant and useful to the user having been previously selected by the user.

[Doc. No. 89-1 at 85, Col. 27:49-28:9.]

West View asserts that these claimed systems/methods are an advancement to a computer-specific technology problem, specifically an improvement in the operation or functionality of the computer system to prevent electronic fraud, such as "spoofing" or "man-in-the-middle (MITM) attacks" in wireless interface systems. [Doc. No. 90 at 6-7.] According to West View these problems are addressed by the patents through "various mechanisms, including (i) use of a short-range wireless protocol (so as to mitigate interception); (ii) use of e.g., <u>reader</u> authentication; and (iii) optional use of encrypted data." [Id. at 7, <u>emphasis</u> in the original.]

BMW argues that the claims of these continuation patents are directed at an abstraction: retrieving data associated with a user and providing relevant information to that user in return. Further, according to BMW: (1) the asserted claims provide no element

or combination of elements that is significantly more than a patent on that abstraction; (2) the asserted claims are not new solutions to fraud prevention in wireless interface systems; (3) the asserted claims do not include limitations of encrypted data protocols, or disclose any new or improved system or method of doing so;[5] and (4) the asserted claims do not recite improvements in the technological function of an RFID tag or advancement in encoding technology, but employ existing systems and methods in conventional ways.

## II.  Legal Standard Under Rule 12(c)

Ninth Circuit procedural law for Rule 12(c) motions applies here. *Imation Corp. v. Koninklijke Philips Electronics N.V.*, 586 F.3d 980, 984 (Fed. Cir. 2009) ("In reviewing a grant of judgment on the pleadings, this court applies the procedural law of the regional circuit."). In the Ninth Circuit, a "motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). The standard under Rule 12(b) is a familiar one, and there is no need to address it at length here. In short, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (holding that the *Iqbal* standard applies to Rule 12(c) motions).

## III.  35 U.S.C. § 101

Section 101 defines the subject matter eligible for patent protection as: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has clarified that Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and

---

[5] Even if a security protocol limitation was included as an element of any of the asserted claims, the specification does not teach any advancement in the utilization of security protocols. Rather the specification discloses that "the use of passwords, encrypted data protocols and spread spectrum techniques for security is well known in the art, and accordingly will not be described further herein." [Doc. No. 89-1 at 39, Col. 18:14-17.]

abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1293 (2012) ("Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.") (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S.Ct. at 2354. Rather, "applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.* (internal quotations and brackets omitted). "Accordingly, in applying the § 101 exception, [the court] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Id.* (internal quotations, citations, and brackets omitted); *see also Potter Voice Tech., LLC v. Apple Inc.*, No. C 13-1710 CW, 2015 WL 5672598, at *2 (N.D. Cal. Jun. 11, 2015) (same).

"The issue of invalidity under Section 101 presents a question of law." *OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-1622-HSG, 2015 WL 1535328, at *2 (N.D. Cal. Apr. 6, 2015). The analysis of whether a patent falls within the exceptions to Section 101 is a two-step process. In the first step, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S.Ct. at 2355; *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). With regard to computer-related technology, this inquiry concerns whether the claims focus on the specific asserted improvement in computer capabilities (in this case West View contends an improvement in electronic fraud prevention in wireless systems) or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). In some cases involving computer-related claims, there "may be close calls about how to characterize what the claims are directed to," in which case, "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *Id.* at

1339; *see also Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("[T]he two stages involve overlapping scrutiny of the content of the claims … [and] there can be close questions about when the inquiry should proceed from the first stage to the second").

At step two, if the claims are directed to a patent-ineligible concept, the Court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 134 S.Ct. at 2355. This second step is also known as "a search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and brackets omitted).

Although novelty, obviousness and enablement, under §102, §103 and §112 are separate considerations from a §101 analysis, certain questions relevant to those determinations overlap with the "search for an inventive concept." For example: Do the elements of the claim, individually or in combination, and viewed in the context of the specification, disclose and teach advancements to the technology to solve the identified problem? Or, do the claim elements merely use known procedures, or conventional steps, specified at a high level of generality? *See Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*, No. 14 C 4957, 2015 WL 3637740, *5 (N.D. Ill. June 12, 2015) *citing Content Extraction & Transmission, LLC v. Wells Fargo Bank, Nat'l. Ass'n,* 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (discounting "well-known" or long-practiced procedures and finding no "inventive concept" in claims that "merely recite the use of [] existing . . . technology").

## IV. Analysis

### A. Abstract Ideas

BMW argues that the claims at issue here are invalid under Section 101 because they are patent-ineligible abstract ideas. "The "abstract ideas" category embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp.*, 134 S.Ct. at 2355

(internal quotations and brackets omitted). "The Federal Circuit has characterized an abstraction as 'an idea, having no particular concrete or tangible form.'" *Potter Voice Tech.*, 2015 WL 5672598, at *2 (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014)).

The '456 patent simply describes the invention as an electronic information access system and associated methods. [Doc. No. 89-1 at 5.] The '834 patent describes the invention as methods and apparatus for providing information useful to a particular user of a computerized apparatus. [Doc. No. 89-1 at 46.] The asserted claims are directed at authenticating a user of the system and providing information to that user that is downloaded to the user's personal electronic device. The claims broadly recite a system employing a wireless device that uses electromagnetic energy as an identifying signal sent to an interrogating receiver, which upon identifying the signal, accesses and provides information associated with the identified user, which is communicated to the user's portable electronic device.

The claim language is result-oriented and functional—requesting a signal from a wireless device; receiving, analyzing and authenticating the response signal; and thereafter providing access to information customized to the user and transmitting that information to that user to be communicated/downloaded to the user's personal electronic device. The physical components of the claims, such as an antenna or interrogator apparatus, a radio frequency device, a processing apparatus, a personal electronic device are generic descriptions of well-known components used to carry out this abstract function. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.,* 838 F.3d 1266, 1270 (Fed. Cir. 2016) (affirming invalidity under § 101 of claims that set forth routine and generic capabilities of computers that the patentee did not invent, and at a level generality known in the art as of the priority date of the patent).

West View describes the asserted claims as inventions that improve the operation or functionality of a computer by "preventing it from being 'spoofed' or subjected to MITM attacks and improv[ing] technology in the field of wireless information provision or

commerce by enabling secure transactions and preventing release of a user's sensitive data to a malicious third party." [Doc. No. 90 at 7.] Although this description implies inventions that introduce advancements to computer technology addressing a problem specifically arising in the realm of computer networks, it is a fiction. There is nothing in the specification to support this representation that the inventions provide new and improved systems, protocols or methods of securing wireless transactions from interception by unauthorized users. Rather the claims recite known RFID tag and reader systems used to provide authentication of system users for access to information.

The asserted claims are directed at identifying an authorized user and providing information to that user. The concept of identifying a system user and then delivering user-specific content to that user's portable electronic device is an abstract idea.

### B. Inventive Concept

Having determined that the claims at issue are directed at abstract ideas, the next step is to "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp.*, 134 S.Ct. at 2357 (internal quotations omitted.) An abstract process could be directed to a patent-eligible subject if it discloses a specific improvement in computer performance designed to implement the process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). However, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp.*, 134 S.Ct. at 2358; *see also DDR Holdings*, 773 F.3d at 1256 ("[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.").

West View emphasizes that the patents claim systems or methods that are an advancement to a computer-specific technology problem, specifically an improvement in the operation or functionality of a wireless computer system to prevent electronic fraud. West View identifies the following claim elements as the purported advancements to the operation of the claimed information system introduced to frustrate interception by a third

party: (1) the use of a short-range wireless protocol; (2) the use of reader authentication; and (3) the optional use of encrypted data.

The asserted claims broadly recite wireless devices to interrogate, receive and transmit signals. When specified in a claim, the only identification and access system disclosed in the patent consists of an RFID tag, a reader and an access database "of the type well known in the art." [Doc. No. 89-1 at 39, Col. 17:49-52.] Independent claim 66 of the '834 patent includes the limitation that the signal sent from the reader/interrogator to the wireless device (i.e., the RFID tag) and the return signal from the wireless device are short-range wireless transmissions.[6] West View asserts that this limitation is an improvement to the operation of the system intended to mitigate interception by third parties. There is nothing in the patent, however, to suggest that West View introduced the use of short-range wireless transmission to RF systems, let alone that West View did so as an advancement intended to mitigate third party interception of the signals. The patent does not disclose how such transmissions would operate if they are an innovation to the operation of RF systems. The specification in fact makes no specific reference to the use of short-range wireless transmission other than to state that the RFID interrogator/reader "has limited range and is directional in nature such that it will not interfere with the readers of other elevators cars nearby or other RF devices." [Id., Col. 18:23-26.]

West View also asserts that the claims introduce the use of reader authentication to the RF system to frustrate third party interception. However, the asserted claims of the '456 patent do not include as a limitation of the system that the RFID tag authenticate the transmission from the interrogator before responding. Therefore, this limitation is not claimed in the '456 patent as a purported advancement in an RF identification system. The asserted method claims of the '834 patent do include the step of the wireless device (i.e.,

---

[6] The only asserted independent claim of the '456 patent, claim 1, does not have a limitation that the transmission be short-range. It appears in dependent claim 8 of that patent. The other asserted independent claims of the '834 patent, claims 1, 36, and 52, also do not have this limitation, but it appears in their dependent claims 4, 37 and 53, respectively.

RFID tag) evaluating or authenticating the signal from the interrogating device to determine if it should respond. [Doc. No. 89-1 at 83-86, Col. 24:66-67; Col. 27:59-62; Col. 30:20-25.] The specification discusses this step of the RFID tag authenticating the tag reader before it transmits a response signal as follows:

> In one embodiment, the RFID tag of the present invention authenticates the tag reader of the access sub-system such that when the tag is interrogated by the reader …, an appropriate code or password must be provided within the RF signal from the reader for the tag to radiate its RF identification signal. In this fashion, unauthorized access to the RF signature or emission of the tag through use of an unauthorized reader are [sic] frustrated.

[Doc. No. 89-1 at 39, Col. 17:54-63.]

The language of the claims reciting this particular step is generic in its description of the function. The RFID tag "evaluates" or "authenticates" the signal received from the interrogator before responding. The specification describes the manner in which such authentication is performed as providing an "appropriate code or password … within the RF signal from the reader for the tag to [identify]." Nothing further is disclosed to explain the operation of this step if such a step was indeed inventive. Nor is there any suggestion that the implementation of this step is a concept introduced in these patents as a security innovation for RF signal transmission systems. To the contrary, the specification represents that there are known methods of defeating this authentication process and therefore suggests the optional implementation of encryption protocols to enhance security. [Id., Col. 17:63-18:7.]

The last claim element West View identifies as an improvement in computer functionality to solve the problem of electronic fraud in wireless systems is the disclosed optional use of encrypted data in the RF signal transmission system. As noted *supra*, none of the asserted claims include limitations of encrypted data protocols or include a step of encrypting or decrypting data. Even if the Court construes claim language requiring the step of authenticating a transmitted signal configured in a way to frustrate unauthorized

access [Doc. No. 89-1 at 86, Col 30:4-25] to implicate the use of encryption protocols, there is no disclosure of any new or improved system or method of doing so. Instead, the specification discloses that "the use of passwords, encrypted data protocols and spread spectrum techniques for security is well known in the art, and accordingly will not be described further herein." [Doc. No. 89-1 at 39, Col. 18:14-17.]

West View does not identify anything else that might constitute an inventive concept. The Court is not persuaded by West View's contention that the claimed systems and methods introduce a security advancement designed to protect the users of portable electronic devices from having their communications intercepted or altered. These wireless communication issues – "spoofing and MITM attacks," asserted by West View as *huge* computer problems of today[7] are not the technology problems identified in the patents. Now a decade and a half after the specification supporting these claims was initially filed, West View's contention that these alleged problems were the motivation for the conception of the claimed inventions is without foundation or even suggestion in the specification.

West View's argument blatantly jettisons any relationship to the actual field of the invention stated in the specification: "the field of personnel transport apparatus, and specifically elevators and similar devices for transporting people from one location to another which incorporate various information technologies." [Id., Col 1:37-42.] It ignores the only problems identified in the patent as the issues to which these claims relate: the goal of replacing magnetic striped cards and card readers, prone to wear and unauthorized use, as a means of restricting elevator access to certain floors during certain time periods, with RFID systems to "allow for automatic recognition of an individual in order to provide

---

[7] As West View itself explains, "electronic 'fraud', 'spoofing', MITM attacks, etc. are a huge problem today for wireless interfaces" [Doc. No. 90 at 11], but provides no citation to any portion of the specification of these patents that indicates these were problems in 1999 (when the specification was originally filed) or that they were the problems addressed by RFID systems claimed.

access to certain restricted locations and initiation of certain functions such as lighting and HVAC." [Id., Col. 2:34-59, 3:15-19.]

Untethered to the problems the patent disclosure identifies, these continuation claims are written at a level of abstraction that purports to claim any system employing a wireless device that sends an identifying signal to a receiver, which upon identifying the signal, accesses and provides information associated with the identified user, which can be downloaded to that user's portable electronic device. Without any reference to actual language in the disclosure required to support its assertions, West View argues that the technological problem being addressed is in the field of wireless information provision or commerce, to enable secure transactions and prevent the release of the user's sensitive data to a malicious third party. [Doc. No. 90 at 7.] This contention only serves to underscore the level of abstraction of these continuation claims and the intention to preempt a field never contemplated in the patent disclosure.

## V.     Conclusion

Having considered the submissions of the parties and based on the language of the asserted claims and the specification common to the patents at issue, the Court finds that the asserted claims of U.S. Patent No. 8,301,456 and US. Patent No. 8,311,834 are not drawn to patent-eligible subject matter under 35 U.S.C. §101 and are invalid. BMW's motion for judgment on the pleadings is therefore **GRANTED**.

It is **SO ORDERED**.

Dated:  December 30, 2016

_____
Hon. Cathy Ann Bencivengo
United States District Judge